# Richmond.

## J. L. Q. MOORE AND OTHERS v. JOE W. PULLEM AND OTHERS.

March 22, 1928.

Absent, Burks, J.

1. ELECTIONS—*Absent Voter's Act—Constitutionality.*—The absent voter's act (Code of 1924, sections 203-218) was carefully drawn for the purpose of preserving the secrecy of the ballot, for the identification of the voter, for publicity as to the actual voting on the day of election, and for the prevention of fraud. The act was based upon sound public policy, and its constitutionality should be upheld unless it clearly contravenes some inhibition to be found in the Constitution. If, however, there be such an inhibition, then the statute is invalid and cannot be upheld.

2. ELECTIONS—*Absent Voter's Act—Constitutionality—Virginia Statute Distinguished from those in which the Vote is to be Cast Outside of the State.*—Under the Virginia absent voter's act the vote is not received outside of the State by others than the regular election officers, and therefore the statute bears slight resemblance to one in which the vote was to be cast outside of the State and counted there by officials other than the regular local election officers.

3. ELECTIONS—*Absent Voter's Act—Constitutionality of Act—Sections 18-21 of the Constitution of 1902.*—The Virginia absent voter's act (Code of 1924, sections 203-218) is not invalid as contravening sections 18-21 of the Constitution of 1902. These sections relate specifically and almost exclusively to the qualifications of the voters, and not, except incidentally, to the conduct of elections. They relate to and prescribe the conditions which must be performed before the time of the election in order to qualify the citizen for voting on the day of the election. They are chiefly conditions precedent which cannot be fulfilled on the day of the election.

4. ELECTIONS—*Absent Voter's Act—Constitutionality of Act—Sections 18 and 21 of the Constitution of 1902—Interpretation and Construction—Language must be Construed in Connection with which it is Used.*—It was argued that the absent voter's act was unconstitutional because of the use of the phrase "the precinct in which he offers to vote," in section 18 of the Constitution of 1902, and because section 21 of

the Constitution of 1902 requires the payment of poll taxes for the three years next preceding "that in which he offers to vote." It was contended that this language imperatively required the personal presence of the voter at the precinct on the day of the election in order to entitle him to vote. But the subjects of these sections of the Constitution are the qualifications of the voters who may register, and the requirements to be fulfilled as prerequisites to the voting, and there can be no more fallacious or misleading method of construing language than to divorce it from the subject in connection with which it is used. If the framers of the Constitution had intended to require the personal presence of the voter, it would have been easy to write in these sections that the voter must be personally present.

5. Constitutional Law—*Presumption in Favor of Constitutionality—Absent Voter's Act.*—The presumption is that the absent voter's act is valid, and those who contend that it is invalid must identify the constitutional provision which plainly invalidates the statute and inhibits the legislature from adopting it. While there can be no fair doubt that sections 18 and 21 of the Constitution of 1902 refer to the qualifications of voters and the requirements to be fulfilled as prerequisites to voting and not to the method of voting upon the day of the election, even if there were such a doubt, it falls far short of that certainty which is absolutely necessary in order that a court may declare a statute unconstitutional, because statutes are not to be nullified by *innuendo* or doubt.

6. Elections—*Absent Voter's Act—Constitutionality of Act—Sections 27 and 36 of the Constitution of 1902.*—There is nothing in section 27 of the Constitution of 1902 on the "Method of Voting" which imperatively requires the personal presence of the voter, and section 36 of the Constitution of 1902 entitled "General Assembly shall enact laws to regulate elections" confers wide power upon the General Assembly.

7. Elections—*How Voter shall Exercise his Right to Vote—Power of General Assembly.*—The general rule is that unless the Constitution, either expressly or by necessary implication, inhibits the General Assembly from providing how a voter shall exercise his right to vote, its power is absolute. If there be no restraint, the General Assembly unquestionably has the power to determine the manner of conducting and making returns of elections. And the Constitution of 1902, section 56, expressly recognizes and emphasizes this power, and directs the General Assembly to exercise it.

8. Elections—*Absent Voter's Act—Personal Presence—Constitutionality of the Act.*—Under section 20 of the Constitution of 1902 the voter who wishes now to register must present himself in person and make his application in writing in person, but when the subsequent sections.

referring directly to the method of voting and the conduct of elections, sections 27, 36 and 56, are scanned, it is found that there is no word in them which requires, or even suggests, that a voter must also then be personally present.

9. ELECTIONS—*Absent Voter's Act—Constitutionality—Secrecy of the Ballot—Fraud.*—In arguing that the absent voter's act was unconstitutional counsel contended that the secrecy of the ballot may be invaded because of the statute, and so that fraud is promoted and made easy thereby. If this be true, it is because the statute is violated, and not because of, but in spite of, the statute, which preserves that secrecy and denounces fraud. Such arguments should be addressed to the law-making power. The only jurisdiction which the judicial power has is to determine whether there is a conflict between the statute and the Constitution.

10. ELECTIONS—*Absent Voter's Act—Constitutionality—Power of General Assembly.*—Under the Constitution of 1902, the General Assembly has the unrestricted power to prescribe the method of conducting elections by secret ballot, which power it is expressly, by section 56, directed to exercise, and this necessarily includes the power to prescribe the conditions under which those who, in accordance with the Constitution, are entitled so to vote, may exercise that right. The absent voters law, in Virginia, does not contravene any constitutional inhibition.

11. MANDAMUS—*Absent Voter's Act—Mandamus Against Election Officials to Require them to Certify and Count Votes Cast under the Absent Voter's Act—Case at Bar.*—In the instant case plaintiff, candidates for office, filed their petition for a writ of mandamus against the judges and clerks of an election precinct, praying that they be required to count and certify to the commissioners of election votes which had been cast by authority of the absent voter's law. When the regular balloting had ceased, the judges of election, instead of opening and counting the absent voter's ballots, refused to do so. These uncounted ballots were returned to the clerk's office. When the commissioners of election met, they summoned the judges of election for the purpose of amending their returns, as authorized by the statute, and at this juncture, before the general results had been tabulated, this petition for mandamus was filed.

*Held:* That mandamus should have been granted.

12. MANDAMUS—*Absent Voter's Act—Mandamus Against Election Officials to Require them to Certify and Count Votes Cast under the Absent Voter's Act.*—Where the judges of election at a precinct failed to discharge a mandatory ministerial duty in refusing to count such of the ballots cast under the absent voter's act as had been deposited by legal voters, they could be compelled by mandamus to discharge such duty as soon thereafter as possible.

13. MANDAMUS—*Failure to Perform a Legal Duty—Mandamus to Compel Discharge of Such Duty as Soon Thereafter as is Possible.*—It cannot be fairly questioned that when public officials charged with a ministerial duty fail to perform it at the time required by law, they can be compelled by mandamus to discharge such duty as soon thereafter as is possible. The neglect of such a duty at the right time does not relieve those at fault from its subsequent performance, if this is essential to preserve substantial rights.

14. ELECTIONS—*Absent Voter's Act—Mandamus to Compel Judges of Election to Count Votes—Case at Bar.*—In the instant case the judges of election failed to perform their imperative duty under the absent voter's act of counting the votes of legal voters cast in pursuance of that act. Subject to their duty to determine whether or not the person offering to vote under the act was then entitled to do so, the judges of election had no discretion except to deposit the ballots, as directed by the statute, and thereafter to count them together with the other legal ballots. It was contended that because the ballots were not counted and certified on the night of the election, they could never be thereafter counted by the judges of election.

   *Held:* That this was an erroneous view, as denying the right of legal voters to participate and imposing as improper burden upon those candidates for office who, if the votes of the absent voters had been counted, would have shown that they were legally elected.

15. ELECTIONS—*Absent Voter's Act—Mandamus—Case at Bar.*—In the instant case petitioners prayed for a mandamus requiring the judges of the election to count the votes cast under the absent voter's law. At the time the petition for mandamus was filed the commissioners of election had summoned these judges of election for the purpose of amending their returns. The trial court entered an order refusing to award the peremptory mandamus.

   *Held:* At the time this order was entered and before the tabulated results of the election had been certified by the commissioners of election, petitioners had the right to require the judges of election to discharge their neglected duty, and the court erred in refusing to award the peremptory mandamus.

16. ELECTIONS—*Absent Voter's Act—Mandamus—Contested Election Proceeding Pending—Case at Bar.*—In the instant case, a proceeding by mandamus to compel the judges of election at a certain precinct to count and certify legal votes cast under the absent voter's law, it was suggested on appeal that there was pending a contested election proceeding, which of necessity involved the legality of the votes offered under the absent voter's law. The Supreme Court of Appeals, therefore, did not award the mandamus, lest it might embarrass and unnecessarily interfere with the due and orderly procedure in the contested election case. Therefore, the court reversed

the order of the lower court, which refused the mandamus, and re-
manded the case to the trial court, with directions to award the
mandamus, if in the future conduct of the contested election case it
shall appear to be necessary in order to maintain any of the sub-
stantial rights of the petitioners here determined.

17. ELECTIONS—*Absent Voter's Act—Contested Election—Counting Votes
Offered Under the Absent Voter's Law and Rejected by Judges of Election.*
—In a contested election case the trial court has plenary power to
have legal ballots offered under the absent voter's law, which the
judges of election refused to count and certify, counted.

Error to a judgment of the Circuit Court of Scott
county, in a proceeding by mandamus. Judgment for
defendants. Plaintiffs assign error.

*Reversed and remanded.*

The opinion states the case.

*R. R. Parker, S. W. Coleman, S. H. Bond,* and *W. S.
Cox,* for the plaintiffs in error.

*Hutton & Hutton, Warren & Widener,* and *J. P.
Corns,* for the defendants in error.

PRENTIS, P., delivered the opinion of the court.

The petitioner, Moore, was a candidate for the office
of treasurer, W. D. Quillen for the office of commissioner
of the revenue, and W. H. Hensley for the office of
justice of the peace for Fulkerson district, Scott county,
at the election held November 8, 1927. The defendants
were judges and clerks of the election at Fraley election
precinct, in that county.

The plaintiffs filed their petition for a writ of manda-
mus against the election officials, praying that they be
required to count and certify to the commissioners of

election sixty-three votes which had been cast by authority of the absent voter's law, originally enacted in 1916 (Acts 1916, page 633), and from time to time amended (1922, 1924, 1926). It is cited as Virginia Code, Ann., 1924, sections 203 to 218, inclusive, but section 205 was amended in 1926 (Acts 1926, page 463).

The constitutionality of the act is challenged by the defendants, as well as the right to the peremptory mandamus, even if the act be constitutional.

The trial court was apparently of opinion that the act was valid, because it overruled a demurrer to the petition, but refused to issue the writ of mandamus, and dismissed the petition, apparently because of opinion that mandamus was not the proper remedy; and that the question could and should be raised by contesting the election.

The record, then, presents two questions to us.

First, as to the constitutionality of the act:

The provisions of the statute may be thus summarized: It provides that a voter who may be absent from the city, or from the precinct of the county in which he is a registered voter, on the day of the election, may, notwithstanding such absence, vote at such election under certain conditions, carefully prescribed. He is required to make application in writing for a ballot to the registrar of his precinct, not less than five nor more than sixty days prior to the date of the election, if he is within the United States at the time, or not less than sixty days nor more than ninety days, if in the Philippines, Hawaii, Porto Rico, the Panama Canal Zone, or in touch with the American consulate in territory over which the United States has no jurisdiction. This application may be presented to the registrar in person, or forwarded to him by mail. When the registrar receives such an application from one who

is duly registered as a voter in that precinct, he is required to enroll the applicant's name and address on a list to be kept by him for the purpose, and to forward to the applicant by registered mail, or deliver to him in person, these papers, which must be supplied by the electoral board: (a) An envelope containing the folded ballot, sealed and marked: "Ballot within. Do not open except in presence of a notary public" (or other officer mentioned in section 208); (b) an envelope for resealing the marked ballot, on which is printed the "voucher," form of which is provided; (c) a properly addressed envelope for the return of said ballot; (d) a printed slip giving full instructions regarding the manner of marking the ballot, in order that the same may be counted, and how prepared and returned; (e) a "coupon" the form of which is hereinafter given.

This is the form of the "voucher" just referred to, which is printed on the envelope in which the ballot is to be sealed after the same has been marked:

"*Voucher.*

"This is to certify that the enclosed ballot was received by me as per my application to the registrar of_____precinct, _____county (or city), Virginia. The envelope marked 'ballot within' was opened by me in the presence of_____, a notary public (or other officer mentioned in section two hundred and eight, *infra*) of_____, marked while in his presence, without assistance or knowledge on the part of anyone as to manner in which same was prepared, and then and there sealed as provided by law.

"(Signed)_____

"Teste:_____

"Notary Public.

(or other person designated in section two hundred and eight)."

The form of the "coupon" referred to is:

"*Coupon.*

"Name (given by voter)........................., color..........., height...................., age (given by voter)......., color of hair .........., color of eyes..........., weight (estimated)......birthplace (given by voter)...................., occupation (given by voter)...................., State and precinct where voter claimed to have last voted.................................

"To the best of my knowledge the above information is correct, and the applicant has complied with the requirements of the law as above provided. I have no knowledge whatever of the marking, erasure, or intent of the ballot enclosed.

"(Signed)...........................................

"Notary Public.

(or other person mentioned in section two hundred and eight)."

The statute also provides that upon receipt of these papers the voter shall not open the sealed envelope marked "ballot within," except in the presence of a notary public, or other officer authorized by law to take acknowledgments to deeds, and that he shall then and there mark and refold the ballot without assistance and without making known the manner of marking it. He is required to place the ballot in the envelope provided for it, seal, fill in and sign the voucher printed on the back of the envelope, heretofore quoted, in the presence of a notary public, or other authorized official, who is required to witness it. This envelope, together with the coupon, which must be filled out and signed by the notary public, or other official, shall be enclosed within the envelope directed to the registrar, which shall then and there be sealed, and shall be registered and mailed to the registrar, or delivered to him in person. The voter receiving such ballot is required to

preserve the secrecy of the ballot, as provided. The official ballots which the electoral board is required to furnish to the registrar must each be properly sealed in an envelope marked: "Ballot within. Do not open except in presence of a notary public" (or other officer mentioned in section two hundred and eight), and they take his receipt therefor; and the registrar must deliver to the judges of election on election day all unused ballots in their original sealed envelopes which remain in his possession, to be by them destroyed as are other unused ballots on that day. When the registrar receives such a ballot from a voter, he shall note in ink on the list required to be kept by him: "Received ballot on .... date," and shall file the coupon enclosed with the sealed ballot, with the letter of application, and deposit the envelope containing the ballot, unopened, in a sealed box to be provided for the purpose, where it must remain until the day of election. Then, on the day of election, in the morning, the registrar is required to post a true copy of the list which is required of him in a conspicuous place at the polling place. The box containing these sealed ballots of absent voters, together with the letters of application and accompanying coupons enclosed in the envelopes, are to be delivered in a box by the registrar to the judges of election at the precinct, taking their receipt therefor.

Then, at the close of the regular balloting on the day of the election, this box shall be opened by the judges of election and the ballots deposited in the regular ballot box, as follows: "As each envelope is removed from the box, the name of the voter is to be called and checked as if the voter were voting in person. If found entitled to cast his vote, the envelope is then, but not until then, opened, and the ballot deposited in

the regular box without examining or unfolding it, and the name of the voter entered by the clerks on the poll books." When all of the ballots have been accounted for and either voted or rejected, the empty envelopes that previously contained the ballots are to be placed in an envelope with letters of application and coupons, and they, together with the rejected envelopes, if any, on which, or attached, shall be plainly written the cause of rejection, signed by a majority of the judges, shall be sealed up with the ballots cast at said election to be delivered as provided by law.

It is made a felony for any person to attempt to aid or abet fraud in connection with any vote cast or to be cast under the provisions of the act, and the punishment is fixed at not less than one nor more than five years in the penitentiary; a person attempting to vote by fraudulently signing the name of a regularly qualified voter is guilty of forgery, and any public official who knowingly violates any of the provisions of the chapter, and thereby aids in any way the illegal casting or attempting to cast a vote, or who shall connive to nullify any provisions of the chapter in order that fraud may be perpetrated, shall forever be disqualified from holding office in the Commonwealth, and shall be disqualified from exercising the right of franchise. The provisions of the chapter are required to be liberally construed in favor of the absent voter.

[1] It is observed then that certainly the act is carefully drawn for the purpose of preserving the secrecy of the ballot; for the identification of the voter; for publicity as to the actual voting on the day of election, and for the prevention of fraud.

It is said that similar statutes are now in effect in the very large majority of States of the Union. Their adoption has been urged by a very numerous and in-

fluential national organization, the Travelers Protective Association, and are generally approved because of the widespread criticism and dissatisfaction growing out of the fact that a large number of the qualified and potential voters habitually fail to exercise the right of suffrage.   There is an enlightened and aroused public opinion, which seeks to encourage and secure the participation of a larger number of voters in the exercise of the suffrage.   That such a statute so based upon sound public opinion, and so safeguarded, should be upheld, and that it is within the power of the General Assembly, cannot be fairly doubted, unless it clearly contravenes some inhibition to be found in the Constitution.   It is equally true, however, that if there is such an inhibition, then the statute is certainly invalid, and cannot be upheld.

The question raised is not new.   There were a number of statutes adopted during the war between the States, designed to permit soldiers in the field to vote, notwithstanding their absence from home.   Some of these were upheld upon the general ground that where the State Constitution is silent as to the place of voting, such statutes are valid.   *Morrison* v. *Springer* (1863), 15 Iowa 304; *Lehman* v. *McBride*, 15 Ohio St. 573; *State ex rel. Chandler* v. *Main*, 16 Wis. 398.   A greater number, perhaps, were held invalid, not in contravention of the rule just stated, but upon the ground that the Constitutions of the particular States involved did limit the legislative power.   *Bourland* v. *Hildreth* (1884), 26 Calif. 161; *Day* v. *Jones* (1866), 31 Calif. 261; *Opinion of Judges* (1862), 30 Conn. 591; *Opinion of Justices* (1863), 44 N. H. 633; *Chase* v. *Miller* (1862), 41 Pa. 403.

[2] The leading case so holding, relied upon by those who contended that the Virginia statute is invalid, is

the case of *People ex rel. Twitchell* v. *Blodgett,* 13 Mich.
127. In a court of four judges, one dissented. The
emphasis in that case is laid upon the previous history
of the constitutional provision then effective in Michi-
gan, and upon the fact that the vote was to be cast
outside of the State of Michigan, counted there by the
military officials, and certified, not to the local elec-
tion officers, but to State officials, and the statute
seems to have been limited to voting for State officials.
It is obvious that the act so condemned in that case
bears slight resemblance to the Virginia statute which
we are now construing. There both the time and
place of the election allowed by the act were out of the
State, while under the Virginia statute the vote is not
received outside of the State by others than the regular
election officials, and is not effective unless produced
by a public official, the registrar, and presented to the
judges of election on the day and at the place in the
State prescribed by law; the right of each voter to cast
a vote at that time and place must then be determined
by the judges of election at that time and place, and
the ballot there publicly deposited in the ballot box by
the judges of election precisely as they are required by
the Virginia election law to deposit each ballot of all of
those other voters who tender their ballots in person
there on that day.

We are not, however, left to rely upon a comparison
of this statute with those like the Michigan statute,
ecause statutes unlike that but similar to the Virginia
act have been frequently upheld in opinions which are
to us convincing. State Constitutions differ and these
differences have naturally led to different conclusions.

[3] This brings us to advert to the Virginia constitu-
tional provisions which it is contended invalidate this
act. They are all contained in Article II, sections 18

to 38, inclusive, referring generally to the elective franchise—specifically, sections 18, 19, 20 and 21, which are relied on, read:

"Section 18. Qualifications of voters.—Every male citizen of the United States, twenty-one years of age, who has been a resident of the State two years, of the county, city, or town one year, and of the precinct in which he offers to vote thirty days, next preceding the election in which he offers to vote, has been registered, and has paid his State poll taxes, as hereinafter required, shall be entitled to vote for members of the General Assembly and all officers elective by the people; but removal from one precinct to another, in the same county, city or town shall not deprive any person of his right to vote in the precinct from which he has moved, until the expiration of thirty days after such removal.

"Section 19. Registration of voters; who are entitled to register prior to 1904.—There shall be general registrations in the counties, cities and towns of the State during the years nineteen hundred and two and nineteen hundred and three at such times and in such manner as may be prescribed by an ordinance of this Convention. At such registration every male citizen of the United States having the qualifications of age and residence required in section eighteen shall be entitled to register, if he be:

"First. A person who, prior to the adoption of this Constitution, served in time of war in the army or navy of the United States, of the Confederate States, or of any State of the United States or of the Confederate States; or,

"Second. A son of any such person; or,

"Third. A person who owns property upon which, for the year next preceding that in which he offers to

register, State taxes aggregating at least one dollar have been paid; or,

"Fourth. A person able to read any section of this Constitution submitted to him by the officers of registration and to give a reasonable explanation of the same; or, if unable to read such section, able to understand and give a reasonable explanation thereof when read to him by the officers.

"A roll containing the names of all persons thus registered, sworn to and certified by the officers of registration, shall be filed, for record and preservation, in the clerk's office of the circuit court of the county, or the clerk's office of the corporation court of the city, as the case may be. Persons thus enrolled shall not be required to register again, unless they shall have ceased to be residents of the State, or become disqualified by section twenty-three. Any persons denied registration under this section shall have the right of appeal to the circuit court of his county, or the corporation court of his city, or to the judge thereof in vacation.

"Section 20. Who may register after 1904.—After the first day of January, nineteen hundred and four, every male citizen of the United States, having the qualifications of age and residence required in section eighteen, shall be entitled to register, provided:

"First. That he has personally paid to the proper officer all State poll taxes assessed or assessable against him, under this or the former Constitution, for the three years next preceding that in which he offers to register; or, if he come of age at such time that no poll tax shall have been assessable against him for the year preceding the year in which he offers to register, has paid one dollar and fifty cents, in satisfaction of the first year's poll tax assessable against him; and,

"Second. That, unless physically unable, he make application to register in his own handwriting, without aid, suggestion, or memorandum, in the presence of the registration officers, stating therein his name, age, date and place of birth, residence and occupation at the time and for the two years next preceding, and whether he has previously voted, and, if so, the State, county, and precinct in which he voted last; and,

"Third. That he answer on oath any and all questions affecting his qualifications as an elector, submitted to him by the officers of registration, which questions, and his answers thereto, shall be reduced to writing; certified by the said officers, and preserved as a part of their official records.

"Section 21. Conditions for voting.—Any person registered under either of the last two sections shall have the right to vote for members of the General Assembly and all officers elective by the people, subject to the following conditions:

"That, he, unless exempt by section twenty-two, shall, as a prerequisite to the right to vote after the first day of January, nineteen hundred and four, personally pay, at least six months prior to the election, all State poll taxes assessed or assessable against him, under this Constitution, during the three years next preceding that in which he offers to vote; provided that, if he register after the first day of January, nineteen hundred and four, he shall, unless physically unable, prepare and deposit his ballot without aid, on such printed form as the law may prescribe, but any voter registered prior to that date may be aided in the preparation of his ballot by such officer of election as he himself may designate."

It is observed, in the first place, that these sections relate specifically and almost exclusively to the qualifi-

cations of the voters, and not, except incidentally, to the conduct of elections. They prescribe the qualifications which a citizen must have, and the antecedent preparations he must make before the day of election in order to entitle him to vote thereafter at the election. They relate to and prescribe the conditions which must be performed before the time of the election in order to qualify the citizen for voting on the day of the election. They are chiefly conditions precedent which cannot be fulfilled on the day of the election.

[4] The sole basis for the very earnest argument which is made against the legislative power is found in the language, "the precinct in which he offers to vote," in section 18, and that in section 21, requiring the payment of poll taxes for the three years next preceding "that in which he offers to vote." It is contended that this language imperatively requires the personal presence of the voter at the precinct on the day of the election in order to entitle him to vote. It is doubtless true that the draftsman of that section had in mind the usual method of voting, but the subjects of the section clearly expressed are the qualifications of voters, who may register, and the conditions precedent for voting, all of which must be satisfied before the day of the election.

There can be no more fallacious or misleading method of construing language than to divorce it from the subject in connection with which it is used. In these sections of the Constitution, the subjects are the qualification of the voter and the requirements to be fulfilled as prerequisites to the voting. In section 18, the subject is the period of residence before the election which is required of the voter, and in order to determine that period the time of the election is necessarily referred to.

That is all to which this part of the section primarily relates. It was necessary to advert to the time of the election in order to determine whether the voter had been a resident for the requisite anterior period. The method of voting upon the day of election is a different subject and is referred to in subsequent sections.

Similar considerations lead to the same construction of section 21, referring to the conditions of voting. Those conditions are that a person must be registered as required by the Constitution, and unless exempted by another section shall, as a prerequisite to the right to vote, pay his poll taxes at least six months prior to the election, which have been assessed or are assessable against him during the three years next preceding "that" (i. e., the year) "in which he offers to vote." Here again, the subjects are the conditions for voting— the conditions precedent to the right to vote thereafter on the day of election.

The framers of the Constitution certainly realized the significance of the words "personal" and "personally," and how easy, if it had been so intended, if they desired to incorporate such a requirement in these sections, to write that the voter must be *personally* present. They provided that he must be personally present in order to register, and that he must personally pay his poll taxes to the proper official; that he must make his oath and application to register to, and hence in the presence of, the registration officials, and that he must personally answer all questions affecting his qualifications.

[5] The presumption is that the act is valid, and those who contend that it is invalid must identify the constitutional provision which plainly invalidates the statute and inhibits the legislature from adopting it. We think that there is no fair doubt as to the proper

construction of these constitutional provisions, but even if there were, such doubts fall far short of that certainty which is absolutely necessary, because statutes are not to be nullified by innuendo or doubt.

[6] We are not left, however, to the consideration of these sections alone. Section 27 of the same article, with the title, "Method of Voting," reads:

"Section 27. Method of voting.—All elections by the people shall be by ballot; all elections by any representative body shall be *viva voce*, and the vote recorded in the journal thereof.

"The ballot-box shall be kept in public view during all elections, and shall not be opened, nor the ballots canvassed or counted, in secret.

"So far as consistent with the provisions of this Constitution, the absolute secrecy of the ballot shall be maintained."

There is no word in this section which imperatively requires the personal presence of the voter. There are such requirements in some of the constitutions, in which such laws have been held invalid. This is particularly true of the New England States, where the town meeting custom has prevailed, and of course wherever there must be a meeting or *viva voce* voting, the personal presence of the voter is necessary.

So again, section 36, the title of which is, "General Assembly shall enact laws to regulate elections," provides: "The General Assembly shall enact such laws as are necessary and proper for the purpose of securing the regularity and purity of general, local and primary elections, and preventing and punishing any corrupt practice in connection therewith; and shall have power, in addition to other penalties and punishments now or hereafter prescribed by law for such offenses, to provide

that persons convicted of them shall thereafter be dis--
qualified from voting or holding office."

[7] Now it must be conceded that the general rule is.
that unless the Constitution, either expressly or by
necessary implication, inhibits the General Assembly
from providing how a voter shall exercise his right to
vote, its power is absolute. If there be no restraint,
the General Assembly unquestionably has the power
to determine the manner of conducting and making
returns of elections. The framers of the Virginia Con--
stitution, however, were not content to leave this
question to be controlled by this general rule, but have
specifically, by section 56, expressly recognized and.
emphasized this power, and directed the General'
Assembly to exercise it. It reads:

"Section 56, Directions to General Assembly con--
cerning elections and declaring offices vacant.—The man--
ner of conducting and making returns of elections, of'
determining contested elections, and of filling vacancies.
in office, in cases not specially provided for by this.
Constitution, shall be prescribed by law, and the
General Assembly may declare the cases in which any
office shall be deemed vacant where no provision is.
made for that purpose in this Constitution."

The cases on the subject are collected in *Jenkins v.*
*State Board of Elections of North Carolina*, 180 N. C.
169, 104 S. E. 346, in 14 A. L. R. 1247, supplemented by
*Re Contested Election in Fifth Ward*, 281 Pa. 131, 126
Atl. 199, 35 A. L. R. 815.

The North Carolina case upholds the absentee voters.
law of that State, and the opinion is a sufficient reply
to every objection which is here made to the Virginia,
act. There, in defining and limiting the right to vote,
section 2 of Article VI of the North Carolina Constitu--
tion requires of the voter a residence in the State for

two years, in the county six months, and in the pre-
cinct, ward or election district in which he applies to
vote four months preceding the election, and section 3 of
the same article declares that every person offering to
vote shall be at the time a legally registered voter, and
section 6 requires that elections by the people shall be
by ballot.   The difference between these provisions and
those in the Virginia Constitution are, that in this State
the corresponding provisions are more elaborate.   They
relate to the same subject, however, and that is pri-
marily to the qualifications of the voters and not to the
conduct of elections.   This is said there:   "That the
Constitution makers did not mean that the words
'offer to vote' should necessarily imply the personal
presence of the voter is indicated by section 4.   In that
section the language is, 'every person presenting him-
self for registration.'   Those words plainly require the
personal presence of the voter.   If the personal pres-
ence of the voter had been required by section 2,
those who framed the article could easily have used
the words 'in which he presents himself to vote.'   Such
language would have put the meaning beyond doubt.
At the time that section of the Constitution was
adopted in 1900, absentee voting laws had been passed
in many States, and in a few cases they had been
before the courts for construction.   The convention
doubtless had knowledge of them, and did not deem it
advisable to preclude the General Assembly, in its
discretion, from enacting such statute whenever it was
deemed advisable to do so."

[8] Because it is so sound, this reasoning may be con-
fidently adopted as applicable in Virginia, for under
section 20 the voter who wishes now to register must
present himself in person and make his application in
writing in person, but when the subsequent sections

referring directly to the method of voting and the conduct of elections, sections 27, 36 and 56, are scanned, it is found that there is no word in them which requires, or even suggests, that a voter must also then be personally present.

The North Carolina court, in this connection, refers to that other fundamental rule, that it is insufficient to raise a doubt as to the constitutionality of the act, saying further: "An act of the General Assembly should not be set aside by implication. A constitution should not receive a technical construction, as if it were an ordinary instrument or statute. It should be interpreted so as to carry out the general principles of the government and not defeat them. In the language of Chief Justice Gibson, cited in *People ex rel. Twitchell* v. *Blodgett* [13 Mich. 127], *supra:* 'When we construe a constitution by implication of such rigor and inflexibility as to defeat the legislative regulations, we not only violate accepted principles of interpretation, but we destroy the rights which the Constitution intended to guard.' "

Another recent case fully supporting these views is *Goodell* v. *Judith Basin County* (1924), 70 Mont. 222, 224 Pac. 1110. The Montana Constitution, section 2 of Article 9, in providing the qualifications for voting, in connection with the period of residence required, uses the language, that "he shall have resided in this State one year immediately preceding the election at which he offers to vote, and in the town, county or precinct such time as may be prescribed by law." The same contention was made there, that such language, by necessary implication, required the personal presence of the elector at the polls, and prohibited the enactment of a statute which authorized the ballot to be delivered to the election officers by mail. This is said:

"Does section 2, Article 9, prohibit the legislature from enacting a statute which permits a tender made in this manner, or does it by necessary implication require the elector himself to make manual delivery of his ballot to the judges of election? The section does prescribe minimum age, citizenship and residence as necessary qualifications of an elector, and, if it undertakes to fix the place or manner of voting, the requirement is to be found in the clause 'at which he offers to vote.' It must be conceded that qualifications to vote, and place or manner of voting, are not homogeneous. The terms involve essentially unrelated ideas. Standing alone, the clause 'at which he offers to vote' is meaningless, and it acquires meaning only by association with the context. Aside from that clause there is not anything in the entire Constitution which suggests an intention on the part of the framers to prescribe the time or place for holding elections, or the manner in which they shall be conducted or the votes cast. In the schedule attached to the Constitution, provision was made for the first election, but the provision spent its force as soon as that election was held. In order, then, to hold that the clause 'at which he offers to vote' was intended to fix the place or describe the manner of voting, we must assume that the learned men who drafted section 2 stopped short in the very midst of defining the qualifications of an elector and injected an idea of an entirely different character; but no one familiar with the rudiments of English would undertake to define qualifications and place or manner of voting by the use of the language employed in section 2 above. The same rules which govern the construction of statutes, are applicable to the construction of constitutions (*State ex rel. Gleason* v. *Stewart*, 57 Mont. 397, 188 Pac. 904), and the meaning and purpose of

section 2 are to be elicited from the terms employed therein, if possible, calling to our aid the ordinary rules of grammar (*State* v. *Centennial Brewing Co.*, 55 Mont. 500, 179 Pac. 296). The clause 'at which he offers to vote' is used as an adjective, and modifies the noun 'election.' It describes a particular election, and thereby fixes a definite point of time from which the residential period is to be computed. The provision of section 2 would mean the same thing if it read: He shall have resided in this State one year immediately preceding the election at which he votes."

These considerations supply the obvious and, to us, the sufficient reply to all of the objections to the power of the General Assembly to enact this statute. The method of voting is not alluded to in the sections relied on, except that it shall be by ballot, be secret, and that some voters may and some may not be assisted in the preparation of their ballots. The method of voting is a different subject, is elsewhere provided for and is incongruous to the subjects of these sections, which, as we have stated and as must be conceded, relate primarily to the voting qualifications, registration and prerequisites. To suppose that the draftsmen of the Constitution paused in the writing of these elaborate provisions relating to these different subjects and interrupted the sequence of thought to digress and to interpolate the requirement that the voter must be personally present to tender his ballot on the day of election, and that in this unusual way and by this equivocal language they intended to inhibit the General Assembly from passing such a statute, appears to us to ignore fundamental rules of construction. The method of voting is elsewhere (section 56) specifically and unequivocally committed to the legislative discretion.

[9] We shall not prolong this opinion by discussing other questions raised by the briefs, among them the contention that the secrecy of the ballot may be invaded because of the statute, and so that fraud is promoted and made easy thereby, except to say that if either of these be true, this is because the statute is violated—not because of, but in spite of, the statute, which preserves that secrecy and denounces fraud. Such arguments should be addressed to the law-making power. In this connection, the only jurisdiction which the judicial power has is to determine whether there is a conflict between the statute and the Constitution.

Other cases in which such statutes have been upheld under substantially similar constitutional provisions are, *Straughan* v. *Meyers*, 268 Mo. 580, 187 S. W. 1159; *Jones* v. *Smith*, 165 Ark. 425, 264 S. W. 950.

[10] The discussion could be much prolonged by reviewing the precedents, and perhaps this view, which we think obvious, might be better stated and emphasized, but we deem this unnecessary because this has been sufficiently done in the cases which we have cited. Under the Virginia Constitution, the General Assembly has the unrestricted power to prescribe the method of conducting elections, by secret ballot which power it is expressly, by section 56, directed to exercise, and this necessarily includes the power to prescribe the conditions under which those who, in accordance with the Constitution, are entitled so to vote, may exercise that right. The absent voters law, in Virginia, does not contravene any constitutional inhibition.

[11] Second: The other question presented by the record relates to the remedy of petitioners, and the denial of the peremptory mandamus.

This is a general summary of the facts: The registrar, acting under the absent voters law, delivered to

the judges of election, in a box, sixty-three ballots, which had been sent or mailed to him (the registrar) by voters to whom he had delivered official ballots in order to enable them to vote. When the regular balloting had ceased, the judges of election, instead of opening this box and counting these ballots, refused to do so— that is, one of them voted in favor of such action, whereas two apparently being of opinion that the statute was invalid, declined so to do. These sixty-three uncounted ballots were, however, returned to the clerk's office, together with the poll books and the seventy-six counted ballots which were presented on that day to the judges of election by the voters in person. When the commissioners of election met on November 10th, to tabulate the votes and certify the general results in the county, there being irregularities, they summoned these judges of election for the purpose of amending their returns, as authorized by the statute. It was at this juncture, before the general results had been tabulated, that this petition for mandamus was filed.

[12, 13] As we have already indicated, the judges of election at Fraley precinct had failed to discharge a mandatory ministerial duty in refusing to count such of these sixty-three ballots as had been deposited by legal voters, so offered to them under the absent voters law. It cannot be fairly questioned that when public officials charged with a ministerial duty fail to perform it at the time required by law, they can be compelled by mandamus to discharge such duty as soon thereafter as is possible. The neglect of such a duty at the right time does not relieve those at fault from its subsequent performance, if this is essential to preserve substantial rights. Their duties on the evening of the election are fixed by Virginia Code, 1924, Ann. section

214, the absent voters law, which reads: "At the close of the regular balloting, the box shall be opened by the judges of election, and the ballots deposited in regular ballot boxes as follows: As each envelope is removed from the box, the name of the voter is to be called and checked as if the voter were voting in person. If found entitled to cast his vote, the envelope is then, but not until then, opened, and the ballot deposited in the regular box without examining or unfolding it, and the name of the voter entered by the clerks on the poll books."

This imperative duty, so clearly imposed upon the judges of election, they failed to perform. They were not, of course, necessarily bound to deposit every one of those ballots in the regular ballot box and thereafter to count and certify them, because they were also required first to ascertain whether each of the persons whose ballots were so offered had been properly registered, and then whether they had qualified themselves to vote at that election by payment of State poll taxes for the three preceding years, and also to consider every other fact which might have then appeared to show that the person was not a qualified voter. For instance, if it then appeared that he had been convicted of crime, or if in the interval he had died, of course, the ballot could not have been legally deposited or counted as a valid vote. Subject, however, to their duty to determine whether or not the person so offering to vote was then entitled to do so (and this responsibility rested upon them also as to each of the other persons offering to vote in person), the judges of election had no discretion except to deposit the ballots, as directed by the statute, and thereafter to count them together with and just as all the other legal ballots were required to be counted and

the result of such count certified to the commissioners of election.

[14] The contention here is that because the ballots were not counted and certified on the night of the election, therefore they could never be thereafter counted by the judges of election. We are of opinion that this is an erroneous view. To sustain it would not only deny the right of legal voters to participate in the election, but if the counting of such ballots would have changed the result, the failure to do so imposes an improper burden upon those candidates for office who, if they had been counted, would have shown that they were legally elected.

[15] In this case the commissioners of election being unable to require the judges of election at Fraley precinct to count these votes, and having been themselves, by mandamus, forced to tabulate and certify the result of the election with these votes uncounted, the consequence is that certificates have been since awarded to those candidates who were not legally elected (if these uncounted ballots would have changed the results), and thus the burden of contesting the election has been unjustly and illegally placed. Our view is that at the time the order here complained of was entered and before the tabulated results of the election had been certified by the commissioners of election, these petitioners had the right to require the judges of election at Fraley precinct to discharge their neglected duty, i. e., to count and certify such of these votes as were cast under the absent voters law by electors who were duly qualified to vote at that election.

Our conclusion, therefore, is that the court erred in refusing to award the peremptory mandamus.

[16, 17] It is suggested, however, that there is pending a contested election proceeding, which of necessity

involves the legality of the votes offered under the absent voters law. Assuming this to be true, the trial court, in that contested election case, has jurisdiction over these ballots, can have them opened, and can require such of them as were cast by legal voters to be counted and given effect. Therefore, we shall not at this time award the mandamus, lest it may in some way embarrass and unnecessarily interfere with the due and orderly procedure in the contested election case. No more difficulties of procedure, however, should result in the defeat of the substantial rights of the parties, if avoidable. Therefore, we shall reverse the order of the Circuit Court of Scott county, which refused the mandamus, and remand the case to the trial court, with directions to award the mandamus, if in the future conduct of the contested election case it shall appear to be necessary in order to maintain any of the substantial rights of the petitioners here determined. Our view is that the trial court, in the contested election case, has plenary power to have such ballots counted so as to ascertain, declare and enforce the results of that election in accordance with the views here expressed. This proceeding should not, however, be dismissed until the rights here adjudicated shall be accorded the petitioners in the contested election case, and then, of course, this proceeding will be terminated in the trial court.

*Reversed and remanded.*

CAMPBELL, J., dissenting:

I am in full accord with the view of the majority, that "the absent voters law in Virginia does not contravene any constitutional inhibition. I am unable, however, to concur in the conclusion that a peremptory writ of mandamus should now issue, compelling the judges of

election to count the sixty-three votes in controversy. This has become a moot question, as the commissioners of election have been compelled by mandamus to perform their duty by issuing certificates of election to those who on the face of the returns were entitled thereto. There is no action which the judges of election can now take which could undo that which has been done. All they could now do would be to meet, count, or not count the votes, as the case might be, and tabulate the result. The commissioners of election having by operation of law ceased to function (*McKinney* v. *Peers, Clerk,* 91 Va. 684, 22 S. E. 506), there is no board or person to whom the judges of election could report the result of whatever action they might see fit to take. While I think the judges of election should have discharged the duty imposed upon them by law governing the disposition of the mail votes, I think those affected by their failure to do so have a complete and adequate remedy by means of the contest which they are now prosecuting.