### WOOD HALL, JUDGE OF ELECTION, ETC., ET AL., ETC. v. HARRY C. STUART, ET AL.

September 4, 1956.

Record No. 4594.

Present, All the Justices.

The opinion states the case.

*H. E. Widener* and *Fred C. Parks* (*George A. Pruner, Widener & Widener*, on brief), for the plaintiffs in error.

*I. M. Quillen* and *Raymond J. Boyd*, for the defendants in error.

BUCHANAN, J., delivered the opinion of the court.

The question presented on this appeal is whether there was error in the order appealed from entered December 28, 1955, by which a writ of mandamus was granted to the appellees requiring the judges and clerks of Dorton Precinct at the election which had been held in Russell county on November 8, 1955, to appear at the courthouse of the county on December 30, 1955, and complete the performance of their duties "in manner and form as provided by law."

The appellees who filed the petition for mandamus were candidates for office at that election, Harry C. Stuart being a candidate for State Senate, W. C. Elliott a candidate for the House of Delegates, and the others candidates for the various county offices. On the face of the returns from all the precincts of the county it appeared that Guy Whited had been elected treasurer of the county over his opponent, J. S. Hargis, by one vote. All of the petitioners except Hargis had majorities which would not be affected by the matters alleged in the petition with respect to Dorton Precinct and were, pursuant to an order entered also on December 28, 1955, in the companion case of *Whited* v. *Fugate et al., Commissioners of Election, post* p. 328, granted certificates of election for the offices to which they had been so elected.

On November 19, 1955, the eleventh day after the holding of the election on November 8, the appellees filed their said petition which resulted in the order of December 28, 1955. They alleged in sub-

stance that a short time after the polls were closed at Dorton Precinct the judges and clerks undertook to proceed with the casting of the mail ballots which had been delivered to them by the electoral board; that almost immediately a controversy arose as to the validity of certain mail ballots, which continued until about two o'clock next morning, at which time it was suggested by the protesting judge that he and his associates be allowed to note their challenges and return the disputed ballots without decision as to their validity, to be passed on by the election commissioners when they counted the vote; whereupon it was agreed that the disputed ballots be packaged separately and returned to the clerk and their validity decided by the election commissioners; that after this agreement the election officials proceeded to canvass the remaining ballots, which task they did not conclude until the middle of the morning of November 9; that said agreement was made by the election judges through misconception and in disregard of their duty and hence their duties had not been performed, their work remained unfinished and the disputed ballots and all other papers and ballots remained in their legal custody although they in fact had been delivered unsealed to the clerk.

The petition prayed that a writ of mandamus issue to compel the election officials of Dorton Precinct to complete the performance of their duties and that the clerk be required to deliver to them all ballots and other papers in connection with said election at said precinct.

The appellants, Wood Hall, one of the judges, and Carlyle Byington, one of the clerks, of the Dorton Precinct, demurred to the petition, which demurrer was subsequently overruled and they filed their answer. They alleged in their answer that the election officials at Dorton Precinct had completed their duties and had canvassed the votes and made return of the results of the election at that precinct to the clerk of the county, who was ex-officio clerk of the commissioners of election. Code § 24-200. They denied that any such agreement as that alleged in the petition was ever made or suggested, and averred that challenges were made to many of the mail ballots, a large number thereof overruled, and challenges to thirty odd were sustained, they being the disputed votes referred to in the petition. They filed photostatic copies of the poll books of Dorton Precinct, which were kept in duplicate, with this certificate appended thereto:

"It is hereby certified that the number of electors at this election amounts to 514 and we further certify that 36 ballots were not counted because void," which certificate was signed by the three

judges and two clerks of election at the Dorton Precinct. The evidence was that 4 of these 36 ballots were defaced and the remaining 32 are the ones immediately involved in this litigation.

Following this is another certificate, as required by § 24-257 of the Code, giving the name of each candidate, the office for which he was a candidate, and the number of votes cast for him; showing that Hargis received 273 votes for county treasurer and Whited 227 votes for that office. This certificate was also signed by the three judges and two clerks.

There was also filed as an exhibit a tabulation of the entire vote of the county, which the commissioners at their meeting following the election caused to be made by the clerk and which showed a majority of one vote for Whited over Hargis for the office of county treasurer.

The answer also alleged that at the conclusion of the voting the judges opened the box containing the mail ballots, each of which was considered, challenges were heard and disposed of, and out of more than one hundred forty mail ballots all but the thirty odd were allowed to be placed in the regular ballot box and the names of the voters placed on the poll books, after which nothing remained to be done except for the commissioners of election to ascertain from the face of the completed returns the persons who received the highest number of votes for the offices; that the commissioners of election in fact met and performed their duties, tabulated the returns and their clerk made out an abstract of the result as shown by the exhibits, and nothing remained for the commissioners to do except to sign and certify the results, after which there was no legal authority for delivering the returns back to the precinct officials, and hence the petition for mandamus should be dismissed.

The answer proceeded to aver that if the ballots and other papers connected with the election at Dorton Precinct should be delivered back to the election officials, then there should be a full inquiry into the validity of all the mail ballots at that precinct because of alleged violations of the absent voters law.

Afterwards voluminous evidence was taken *ore tenus*, much of which would have been relevant only in a contest of the election. On the main point it was involved in serious conflict and from it the court concluded "that there was some kind of an understanding or an agreement that these 32 votes would be set aside and were not on that night definitely disposed of by the judges."

The three judges of election at Dorton Precinct, appointed pur-

suant to § 24-30 of the Code, were John S. Dorton and N. S. Bostic, representing the Democratic party; and Wood Hall, representing the Republican party. James Osborne and Carlyle Byington were the clerks appointed pursuant to Code § 24-194. J. S. Hargis was the Democratic candidate for the office of county treasurer and Guy Whited was the Republican candidate for that office.

When the polls were closed it became the duty of the judges to proceed to canvass the votes "and such canvass shall continue without adjournment until the result thereof is declared." Code § 24-258. Such canvass "shall be in the presence of at least two representatives from each political party represented in the election, . . ." Code § 24-260. During the canvass at Dorton Precinct two State troopers were present at the behest of Dorton. One of them said each side might pick one man, so Dorton and Bostic chose N. C. Meade, Jr., and Hall chose Walter Hartsock.

Mail ballots are required to be deposited by the electoral board in their unopened envelopes with attached papers in a separate container which shall be sealed and delivered to the judges of election on election day. At the close of the regular balloting this container shall be opened by the judges, and as each envelope is removed from the container the name of the voter shall be called, and if he is found entitled to vote the envelope shall then be opened, the ballot deposited in the regular ballot box and the name of the voter entered on the poll books. Code §§ 24-338, 24-340, 24-341.

At the Dorton Precinct there were 146 mail ballots out of a total vote of 550. Eighty-eight of these 146 were mailed to Castlewood, Virginia, in care of N. C. Meade, Jr., a party worker. Of the 32 ballots in question, 24 were mailed to Castlewood, Virginia, in care of N. C. Meade, Jr.; and with respect to these 24 ballots, as well as 4 others of the 32, he was the notary public in whose presence they were opened and marked and who notarized the voucher on the back of the envelope in which the marked ballot was placed, as required by Code § 24-334.

The challenges to these 32 ballots endorsed on the envelopes which contained them were on these grounds: 4 because the voter's name was signed to the voucher by a cross-mark; 11 because the voters were non-residents; 3 because the voters were not registered or improperly registered; 4 because no coupon was enclosed with the ballot; 3 because the voucher was not signed or was improperly

signed; 2 because poll taxes had not been paid; 5 on miscellaneous grounds.

At Dorton Precinct the polls were closed about 6 p. m. and the processing of the mail ballots began in the presence of the election officials, the two party representatives named above, and the two State troopers. After two or three of the mail ballots were cast a controversy arose over the ballots of James Fugate and his wife and Charlie Dickenson, whose votes were challenged by Hartsock on the ground that they were non-residents. This controversy lasted until about 7:30 p. m. when, according to the testimony of Bostic, somebody suggested that they be put over at the back of the box "and let them come last and maybe by that time we will decide what to do with them." Bostic further testified that after a few more ballots were processed another controversy arose and then Hartsock made this proposition: "He said let us just go ahead now with these votes and let us challenge whatever we want to, and then when they are rechecked, why it will be done by men that knows more about it than we do, and they will be closer to legal advice, and said there is no doubt in my mind but what some of these votes that were challenged will be put in."

Bostic said that he studied over this a while but finally decided he would go along with them, "provided that you will write the grounds or the reasons why you challenge these votes on the envelope that contains the ballot and sign your name to it." He testified that Dorton "never said anything."

Dorton testified that after the argument had continued for a long time over the Fugate ballots, Hartsook said, " 'I'll tell you what, let's do, let's just lay them back. We don't know the law, and can't find it right now.' He said, 'Let some fellows or canvassers or the commissioners settle this.' He said, 'We don't know the law on it, can't agree on it.' " He said that arrangement was agreed to and these 32 ballots were put in one end of the box they came out of.

Osborne, one of the clerks, and Meade, the Democratic representative, corroborated the evidence of Bostic and Dorton that such an agreement was made. Hall, the Republican judge; Byington, the Republican clerk, and Hartsock, the Republican representative, categorically denied that any such agreement was made. The two troopers did not testify.

Hall testified that the mail ballots were all processed; that those which were challenged were discussed and if the ballot was found

valid it was put into the regular ballot box; but if not, it was rejected and the challenge written on it; that all the mail ballots, including the 32, were dealt with that way except the Fugate and Dickenson ballots, which were laid aside temporarily, and after all the mail ballots had been processed these three were taken up again and discussed and he agreed for them to go in. These three were the last votes listed on the poll books. The processing of these mail ballots were finished about two o'clock that night.

While the cause of challenge was written on each of the 32 ballots and signed by the challenger, none was marked rejected and signed by the judges as directed by § 24-342 of the Code.

The election laws make it the duty of the judges of election to ascertain whether the number of ballots in the ballot box corresponds with the number of names on the poll books, after which the poll books shall be signed by the judges and attested by the clerks; and there shall be set down on the poll books, next after the certificates of the judges at the foot of the list of electors "as the returns of the election," the name of every person voted for and the number of votes he received for the office for which he was a candidate. Code §§ 24-262, 24-264, 24-265.

The poll books at Dorton Precinct, which were introduced in evidence, were duly completed and signed in compliance with these provisions by the three judges and the two clerks (the name of Byington, one of the clerks, who was then absent was signed by Osborne, the other clerk, at the suggestion of Dorton, and later approved by Byington). Next day after the election the ballot boxes and the poll books, not sealed as required by § 24-267 of the Code, were delivered by the election officials to the county clerk in his office.

When these materials were delivered to the clerk nothing was said to him by the election officials about there being 32 ballots undisposed of by them, or anything about an agreement that they should be submitted to the commissioners of election for their action. Dorton said the clerk asked him why they did not seal these ballots and poll books, and he replied that "the canvassing board has to go through these mail ballots and we just left it open for them to finish it."

The commissioners of election met on Thursday, November 10, the second day after the election, as required by § 24-271. Neither the clerk nor anybody else reported to the commissioners that there were uncounted ballots at the Dorton Precinct which they were to decide on. At that meeting the commissioners proceeded to open the several

returns from all the precincts of the county, as required by § 24-271, and to "ascertain from the returns," § 24-272, who had received the greatest number of votes for the several offices, after which the clerk made out an abstract of the votes, as required by § 24-278.

The results so ascertained by the commissioners from the returns of the election were not signed as required by § 24-272. Instead the commissioners summoned the judges of the Dorton Precinct and from some other precincts to appear before them on the following Saturday, November 12, pursuant to § 24-275, which provides that this shall be done when "irregularities or informalities" exist in the returns which can be cured by amendment or correction. The only thing that appeared then to be wrong with the Dorton poll books was that they did not contain a report of the soil conservation ballots voted at the same election. It was not then suggested to the commissioners from any source that there were mail ballots at the Dorton Precinct which the judges had not counted, although it was then a matter of public information and known by some on election night that the returns showed Whited to have been elected by one vote.

At the meeting of the commissioners on November 10 Hargis appeared with his attorney and requested that the judges of Dorton Precinct be summoned to appear before the commissioners without assigning any specific reason therefor, and they were advised by the commissioners that they had already directed that to be done. When the Dorton officials appeared before the commissioners on November 12, Dorton and Bostic contended that there was an agreement among the election judges that the 32 ballots were to be counted by the commissioners. Hall contended that there was no such agreement; and after hearing their statements the commissioners adjourned without further action until December 28, when they were ordered by the court to proceed with the returns of the election as they were at their first meeting on November 10 and certify therefrom who was elected to the various offices except the office of treasurer, as appears in the case of *Whited* v. *Fugate*, above mentioned.

■ Very clearly the commissioners of election had no authority to rule on the validity of these 32 ballots. They could neither add to nor subtract from the votes as certified to them by the election officials on the poll books. Their duties were limited to ascertaining the persons who received the greatest number of votes on the face of the returns after correcting any irregularities or informalities that appeared therein. Code §§ 24-272, 24-275. "When the result of the

election had been ascertained from the returns, and had been signed by the commissioners, and attested by the clerk, and had been annexed to the abstract of the votes cast, the duties of the board ceased and determined." *McKinney* v. *Peers*, 91 Va. 684, 686-7, 22 S. E. 506, 507. Their duty "is to take the returns as made to them from the different voting precincts, add them up, and declare the result. Questions of illegal voting, and fraudulent practices, are to be passed upon by another tribunal." *Lewis* v. *Commissioners of Marshall County*, 16 Kan. 102, 108, 22 Am. Rep. 275, 279.

Neither was there any authority in the judges of election to make such an agreement as here alleged. It was their plain duty under the statute to canvass the vote and to continue therewith without adjournment until the result was declared. § 24-258. That they did canvass all of the 146 mail ballots is conceded. Admittedly they were engaged in that task from around eight o'clock until two next morning. Many were objected to, passed on and put into the regular ballot box. Dorton was asked about the procedure when a mail ballot was challenged. He replied, "We asked the questions and argued with them about it," and "They just out-argued us and we laid in back there," "over in that pile with the rest of them." He said he knew some of these 32 ballots were not legal and the judges could have passed on them but they did not and just laid them all back.

In the circumstances disclosed by this record we conclude that mandamus was not an available remedy and should not have been ordered to issue.

[■■] "Mandamus should never issue unless the petitioner's right to it is clear. * *." *Kidd* v. *Moore*, 152 Va. 139, 148, 146 S. E. 287, 289. It should be issued only where there is a clear and specific legal right to be enforced, or a duty which ought to be and can be performed, and where there is no other specific and adequate legal remedy, and it is never granted in doubtful cases. *Milliner's Adm'r* v. *Harrison*, 32 Gratt. (73 Va.) 422, 426; *Tyler* v. *Taylor*, 29 Gratt. (70 Va.) 765, 766-7.

"The writ of mandamus being justly regarded as one of the highest writs known to our system of jurisprudence, it only issues where there is a clear and specific legal right to be enforced, or a duty which ought to be and can be performed, and where there is no other specific and adequate legal remedy. The right which it is sought to protect must therefore be clearly established, and the writ is never granted in

doubtful cases. \* \* Thus, where by granting the writ the court would, in effect, decide questions of grave importance concerning the official status of parties not before the court and who have had no opportunity of being heard, it may very properly refuse a mandamus, although the case presented is in other respects an appropriate case for the exercise of the jurisdiction. \* \*." High's Extraordinary Legal Remedies, 2d ed., § 9, pp. 12-13. 55 C.J.S., Mandamus, § 325 at pp. 560-563.

One of the fundamental principles underlying the entire jurisdiction is that mandamus never lies where the party aggrieved has another adequate remedy at law, by action or otherwise; and wherever an express remedy is afforded by statute, plain and specific in its nature, and sufficiently adequate to redress the grievance complained of, mandamus will not lie. High's Extraordinary Legal Remedies, 2d ed., § 15, p. 20; §16, p. 21. "Nor will the writ go to compel the issuing of a certificate of election when a statute has provided an adequate and complete remedy for contesting the election, of which the relator has neglected to avail himself at the proper time." *Idem*, § 62 at p. 66.

"\* \* When it becomes necessary to go beyond the returns and consider questions touching the legality of the election, or of fraud, illegal voting or the like, then mandamus is not the proper action, and it is necessary to resort to quo warranto, or to such statutory proceeding as may be provided in such cases." McCrary on Elections, 4 ed., § 398, p. 296. *State* v. *Churchill*, 15 Minn. 455, 460.

■ Sections 24-430 *ff*. of the Code provide that the returns of election of county officers shall be subject to inquiry and determination by a three-judge court on complaint of an undue election *or false return* filed "within ten days after the election," listing the votes improperly received or rejected. The matter is to be heard on depositions or other evidence and in judging of such "election or return" the court shall proceed on the merits and decide the case according to the Constitution and laws.

The return of election made and signed by the election officials, as stated above, certified that at Dorton Precinct the number of electors was 514 and that 36 ballots (which included the 32 mail ballots in question, the other 4 being rejected as defaced) were not counted because void.

The object of the petition for mandamus and of the evidence introduced in support of it was in effect to show that this was a false return and that in fact these 32 mail ballots were not counted by the

judges under an agreement that they should be referred to the commissioners of election for determination. It was denied on the other hand that any such agreement was made and on the contrary it was asserted that these mail ballots were processed and on challenge were rejected. The evidence, both direct and circumstantial, left the matter in doubt, and its sufficiency to contradict and set at naught the written certificates of the judges, made pursuant to their statutory duty, was at least open to grave question.

The relief sought by the petition for mandamus necessarily goes beyond the returns and raises questions tantamount to fraud or mistake, the adjudication of which is beyond the scope of mandamus.

The order directing the mandamus requires the clerk to turn back to the judges and clerks of election all papers, poll books, ballots and other material of the Dorton Precinct, and requires those officials to complete the performance of their duties in manner and form as provided by law. The judges of election would thereby be compelled to perform a task which a majority of them have said they were unable to perform, and which involves the exercise of judgment and discretion, not a mere ministerial act within the ordinary function of a writ of mandamus. In the performance of the duties so required, these officials would not and could not have the supervision and assistance of the court. The serious questions involved would be decided by a tribunal whose members would now take up the task after a heated legal controversy in which they disputed as to the facts, and where judgment and decision could be swayed by partisanship and affected by the knowledge that one or two votes would change the result, all in a proceeding to which Whited, whose office is at stake, is not a party.

Not only so, but unlike the court they could not compel the attendance of witnesses who may be necessary to establish the validity or invalidity of many of the challenges, particularly those on the ground of non-residence of the voter. Nor is it probable that the voter whose ballot has been challenged could be given the opportunity to take the oath as provided by § 24-254 of the Code.

Where, as here, it cannot fairly be said that the right to mandamus is clear, where it is sought to go behind and contradict the returns on the strength of an agreement which was disputed, the terms of which were not certain and which if made was illegal and ineffective, and where there is a statutory remedy not only plain and adequate, but by its terms applicable to the situation, and affording a method of settling

the dispute according to the principles of justice and right, the extra-ordinary remedy of mandamus should not be used. *State ex rel. Robinson* v. *Hutcheson*, 180 Tenn. 46, 171 S. W. 2d 282, 168 A. L. R. 850 and Anno. at 855; *State ex rel. Toon* v. *Thompson*, 204 Ind. 560, 185 N. E. 117; 2 Spelling, Injunctions and Other Extraordinary Remedies, 2d ed., § 1374, p. 1180; § 1386, p. 1197.

Petitioners argue that their right to mandamus was established by the case of *Moore* v. *Pullem*, 150 Va. 174, 142 S. E. 415; but that case presented a different situation from this. There the judges of election made no attempt to process the mail ballots but refused to open the box which contained them, and the petition for mandamus was promptly filed before the general results had been tabulated. While the right to mandamus was held to exist, it was not awarded but the case was remanded to the trial court with direction to award it if in the conduct of the contested election case then pending it became necessary in order to maintain the substantial rights of the petitioners.

After that case was remanded the trial court issued a writ of mandamus "aside from and outside of the contested election cases." Pursuant thereto the election officials counted all the mail ballots, 63 in number, and declined to consider any challenges thereof for any cause. This changed the result and on the face of the changed returns showed that Moore instead of Kidd had been elected treasurer and a certificate of election was ordered to be issued to Moore, not-withstanding that previously the returns had been canvassed and a certificate of election issued to Kidd. A writ of mandamus was then issued requiring Kidd to surrender the office to Moore. On appeal by Kidd it was held that these writs of mandamus should not have been issued because every question properly arising as to the title of the office was before the court in the pending contested election case, and the most direct method would have been to require these 63 mail ballots to be brought into court and have the legality thereof determined by the court. *Kidd* v. *Moore, supra*, 152 Va. 139, 146 S. E. 287.

In the meantime Kidd and others had filed a petition for mandamus to compel the commissioners of election to ascertain from the face of the returns as first submitted to them the persons who had received the greatest number of votes. The answer to the petition set up the defense that the 63 mail ballots above mentioned had not been counted and hence the returns were not complete, and quoted a certificate purporting to have been signed by a majority of the judges and a

clerk of the election that by agreement the sealed box containing the 63 mail ballots had been delivered to the county clerk and if the "election authorities" advised that it was proper to open the box and count the ballots it would be done by the judges and their returns accordingly completed. The matter was heard on the petition and answer, together with an admission that the commissioners had not canvassed the returns and tabulated and certified the results of the election. The Corporation Court of Bristol, to which the case had been transferred, directed a mandamus to issue compelling the commissioners to reconvene and to ascertain from the returns from all the precincts of Scott county the results of the election and to certify the results and make abstracts thereof. A writ of error to that order was refused by this court on February 8, 1928, *Quillen, et al.* v. *Craft, et al.*, 148 Va. XXV.

The order of December 28, 1955, directing the mandamus to issue is reversed and the petition therefor is dismissed.

*Reversed and dismissed.*