STATE EX REL. GLEASON, RELATOR, *v.* STEWART, SECRE-TARY OF STATE, RESPONDENT.

(No. 4,574.)

(Submitted February 28, 1920.   Decided March 22, 1920.)

[188 Pac. 904.]

*Mandamus—Constitution—Initiative and Referendum—Suspen-sion of Act—Petitions—Sufficiency—Constitutional Construc-tion—Elections—"Legal Voter"—County Clerk—Irregulari-ties—Effect.*

Constitution—Referendum Petition—Number of Signatures Required.
   1.   Under the amendment to section 1 of Article V of the Constitution, a petition for referendum to be effective must be signed by five per cent of all the legal voters of the state, and each of two-fifths of all the counties must furnish as signers five per cent of the legal voters of that county; if then the whole number from those counties does not make the required five per cent, the petition may be rendered effec-tive by a sufficient number of signers from other counties to supply the deficiency.

Same—Referendum—Suspension of Act—Number of Signatures Required.
   2.   *Held,* on *mandamus,* that where suspension of a legislative Act pending submission thereof to a vote of the people is sought through the medium of a referendum, the petition must be signed by fifteen per cent of the legal voters of a majority of the whole number of counties of the state,—not by fifteen per cent of all the legal voters of the state.

Same—Construction—Rules Applicable.
   3.   The rules applicable to the construction of statutes are also appli-cable to the construction of provisions of the Constitution.

Same.
   4.   In construing a provision of the Constitution (or statute), courts must first ascertain its purpose and intent, taking in its obvious sense the language used, aided by the ordinary rules of grammar; recourse

~ to other rules of construction not being permissible until failure of this method of construction.

Elections—"Legal Voter"—Definition.
  5.  A legal voter, possessing the qualifications of citizenship, age, residence, *etc.,* is one who has registered.

Referendum—County Clerk—Certifying List of Legal Voters—Invalid Provision.
  6.  *Held,* that the provision of section 108, Revised Codes, requiring county clerks to compare the signatures on a petition for referendum with their signatures on the registration books and blanks for the preceding general election and certify them to the secretary of state as legal voters, is invalid as excluding all persons who had become legal voters in the interim between the last general election and the time of signing such petition.

Same—Constitution—County Clerk—Irregularity in Certifying Number of Legal Voters—Effect.
  7.  A legal voter cannot be prevented from exercising his constitutional privilege of signing a referendum petition looking to the suspension of an Act of the legislature, by a showing that a county clerk had not technically pursued the direction of the statute in ascertaining the number of legal voters of his county entitled to sign the petition.

Original application for *mandamus* by the State, on relation of William L. Gleason, against Charles T. Stewart, as Secretary of State.   Proceeding dismissed.

*Messrs. Gunn, Rasch & Hall,* for Relator, submitted a brief; *Mr. M. S. Gunn* argued the cause orally.

*Mr. S. C. Ford,* Attorney General, *Mr. Frank Woody,* Assistant Attorney General, *Mr. Henry C. Smith* and *Mr. Wellington D. Rankin,* for Respondent, submitted a brief; *Mr. Woody* and *Mr. Rankin* argued the cause orally.

MR. CHIEF JUSTICE BRANTLY delivered the opinion of the court.

Original application for *mandamus* to compel the secretary of state to accept and file nominating petitions tendered to him under the provisions of Senate Bill 32 (Chap. 28, Ex. Sess. Laws 1919), which amends the primary law enacted by the people at the general election held in November, 1912.  It is alleged in the affidavit for the writ that within six months after the adjournment of the legislature there was filed in the office of the secretary of state in the form prescribed by section 106

of the Revised Codes, a petition signed by more than five per cent of the legal voters of the state, and more than five per cent of the legal voters in more than two-fifths of the counties in the state, ordering that said Senate Bill 32 be referred to the people for their approval or rejection at the general election to be held in November of this year; that the petition was not signed by fifteen per cent of the legal voters of the state, nor by fifteen per cent of the legal voters of each of the majority of the counties in the state, and that no other petition relating thereto had been filed; that, notwithstanding the fact that less than fifteen per cent of the legal voters of the state, and less than fifteen per cent of the legal voters of each of a majority of the counties in the state, have signed the petition, the secretary of state has notified the governor in writing that Senate Bill 32 had been suspended and is inoperative; and that the secretary of state is proceeding upon the presumption that the bill is inoperative and refuses to accept or file the nominating petition of any candidate for a state or other office required to be filed in his office and necessary to authorize the name of any such candidate to be printed on the official ballot to be used at the primary nominating election to be held on April 23 of this year, as in said senate bill provided, and for this reason refuses to comply with the other requirements of the primary law which are not in any wise changed or amended by Senate Bill 32, which compliance is necessary to the holding of the primary nominating election.

In response to the alternative writ, the attorney general appeared by a motion to set it aside and dismiss the proceeding on the ground, among others, that the facts stated in the affidavit did not entitle relator to the relief demanded. The court sustained the motion, announcing orally that it would later, in a written opinion, state the reasons for its action.

The principal question presented by counsel was whether, to [1] suspend the operation of an Act of the legislature under section 1 of Article V of the Constitution, commonly referred to as the initiative and referendum amendment, the petition to

refer must be signed by fifteen per cent of the legal voters of the state. So far as pertinent here, this section reads: " * * * The first power reserved by the people is the initiative and eight per cent of the legal voters of the state shall be required to propose any measure by petition: Provided, that two-fifths of the whole number of the counties of the state must each furnish as signers of said petition eight per cent of the legal voters in such county. * * * The second power is the referendum, and it may be ordered either by petition signed by five per cent of the legal voters of the state: Provided, that two-fifths of the whole number of the counties of the state must each furnish as signers of said petition five per cent of the legal voters in such county, or, by the Legislative Assembly as other bills are enacted. * * * Any measure referred to the people shall still be in full force and effect unless such petition be signed by fifteen per cent of the legal voters of a majority of the whole number of the counties of the state, in which case the law shall be inoperative until such time as it shall be passed upon at an election, and the result has been determined and declared as provided by law. The whole number of votes cast for Governor at the regular election last preceding the filing of any petition for the initiative or referendum shall be the basis on which the number of legal petitions and orders for the initiative and for the referendum shall be filed with the secretary of state. * * * "

The section is not expressed in the clearest and most appropriate language, and is therefore obscure in some respects; but, taken as a whole, we think the purposes sought to be accomplished by its several provisions are not difficult to ascertain. It is clear that, in order to be effective, a petition for a referendum must meet two requirements: (1) It must be signed by five per cent of all the legal voters in the state, taking as the basis for calculating the percentage the whole number of votes cast for governor at the last preceding election; and (2) each of two-fifths of all the counties of the state must furnish as signers five per cent of the legal voters in that county. If each

of two-fifths of the counties have furnished the necessary percentage of signers, but the whole number from these counties does not make five per cent of all the legal voters in the state, the petition may be rendered effective by signers enough from other counties to make up the required percentage of the entire number of legal voters in the state. It will be observed that the distribution of the signers of a petition to initiate a measure and one to order a referendum is the same; the two being different only in the necessary percentage of the whole number of legal voters. These conclusions are made necessary by the plain and explicit terms in which the two provisions are expressed.

When we come to examine the provision relating to the requirements of a petition to suspend the operation of a measure [2] until the people have had an opportunity to approve or reject it, we find it embodies a different plan. A measure referred to the people is in full force and effect as a law unless "such petition be signed by fifteen per cent of the legal voters of a majority of the whole number of the counties of the state." Obviously, under this provision, there cannot be a suspension without a referendum. The expression "such petition" can have reference to nothing other than to a petition signed by a sufficient number of legal voters so distributed as to require the ordering of the referendum. To obtain the suspension, however, the additional requirement is not the signing by fifteen per cent of the legal voters of the state distributed over a majority of the counties of the state, but fifteen per cent of the legal voters of a majority of the whole number of counties of the state. Counsel for the relator insisted that the only way which would harmonize this provision with the referendum provision and give effect to the clear intent of the section that there shall be a larger number of signers to suspend an Act than to refer one was to construe this provision as requiring fifteen per cent of all the legal voters of the state; that is, the provision must be construed as though it read "fifteen per cent of the legal voters of the state and of each of a majority of the whole number of counties of the state." When we note the specific re-

quirement of signatures by fixed percentages of the whole number of voters in the state in both the petitions to initiate and to refer measures, and the omission of this requirement from the suspension provision, the conclusion is unavoidable that the omission was made intentionally, and that it was deemed sufficient to order a suspension if, in addition to the five per cent of the whole number of voters signing the petition for a referendum, there should be enough signers from other counties to make up the required fifteen per cent of the legal voters in each of a majority of the whole number of the counties of the state.

It was entirely within the province of the people in adopting the amendment to make the several requirements as we find them, though it omits to require the signatures of a percentage of all the legal voters in the state to suspend a measure, as it does in case of initiative and referendum petitions, to accomplish their respective purposes. That this is so, however, is no valid reason why this court should conclude that the omission occurred by mistake, rather than that it was made on purpose. The suspension provision being expressed in terms clear and definite, it is not within the province of the court to undertake to harmonize it with the other provisions by interpolating in it words which would give it a meaning substantially different [3] from that which it expresses. The same rules apply to the construction of provisions of the Constitution as apply to the construction of statutes. (*State ex rel. Maddox* v. *Kenney*, 11 Mont. 553, 29 Pac. 89; *Dunn* v. *City of Great Falls*, 13 Mont. 58, 31 Pac. 1017.) As we have said, the section, as a whole, is not expressed in the clearest and most appropriate language; [4] yet, when we have elicited from it the particular purposes and intentions of its several provisions, taking in their obvious sense the terms in which they are expressed, calling to our aid the ordinary rules of grammar, our task is ended. This is the elementary rule of construction. Other rules may be resorted to only when this fails. (*Jay* v. *School Dist. No. 1*, 24 Mont. 219, 61 Pac. 250, and authorities cited; Cooley's Constitutional Limitations, 7th ed., 89.) .

The next contention made was that the petition was not signed by fifteen per cent of the legal voters of each of a majority of the counties of the state. It was conceded by counsel for relator that upon the face of it the petition was in proper form in every respect, and was apparently signed by the required number of legal voters from each of a majority of the counties. It may be remarked in passing that, while we have referred to the petition filed with the secretary of state as one petition, it is in fact made up of one or more petitions from each of the several counties. These, certified by the clerks of the several counties, as required by the statute, and filed with the secretary of state, are taken together as the petition referred to in the Constitution.

Counsel for relator were permitted, over the objection of the attorney general that it was incompetent, to introduce the testimony of the clerks of Wheatland, Treasure and Glacier counties, which tended to show that they had not compared the signatures of certain voters which were attached to the petitions from these counties, to ascertain that they were genuine as provided by the statute in that behalf. For illustration: Wheatland county was created out of portions of Meagher and Sweet Grass counties by an Act of the legislature which became a law on February 22, 1917 (Laws 1917, Chap. 55). At the time the petitions signed by voters in this county were presented to the county clerk for comparison and certification by him, the only registration cards in his office or other records bearing the original signatures of registered voters in that county at the preceding general election were the cards of those who had registered after the creation of the county; all others being copies authorized by the Act creating the county to be made from the original registration books and cards on file with the clerks of Sweet Grass and Meagher counties. It was therefore impossible, as we shall see later, for him to comply technically with the statute. The testimony of the clerks of Treasure and Glacier counties—both created since the election of 1916—was to the same general effect. Counsel insisted that the signatures of

these voters which appeared upon the copies and of those regis-
tered since 1916 must be eliminated; that, this being done, the
petitions from these counties were upon their face insufficient
because the remaining signatures represented less than fifteen
per cent of the legal voters of these counties; and that hence
these petitions should not be considered for any purpose, with
the result that there were left petitions from only twenty-four
of the fifty counties in the state, or less than a majority of the
whole number.

Section 108 of the Revised Codes prescribes the duties of the
[5, 6]    county clerk in any county in which a petition is signed
and those of the secretary of state in determining the sufficiency
of it when filed in his office.    A brief epitome of this section,
so far as is pertinent here, is the following: The clerk is re-
quired to compare the signatures of those signing a petition with
their signatures on the registration books and blanks on file
in his office, "for the preceding general election," and, after
doing so, to attach to the sheets of the petition containing the
signatures his certificate to the secretary of state showing sub-
stantially that he has made the comparison as directed; that he
believes the signatures of the signers, setting forth their names
and numbers, are genuine; that, as to the remaining signatures
thereon, he believes that they are not genuine, stating the reason;
and, further, that these names, giving a list of them, do not
appear on the registration books and blanks in his office.
"Every such certificate shall be *prima facie* evidence of the facts
stated therein, and of the qualifications of the electors whose
signatures are thus certified to be genuine, and the secretary
of state shall consider and count only such signatures on such
petition as shall be so certified by such county clerks to be gen-
uine."    There is added a proviso that this officer may consider
and count such of the other signatures as may be proven to be
genuine, and that the parties so signing were legally qualified
to sign.    The proof must be by the official certificate of a notary
public of the county in which the signers reside.    It further
prescribes the form of certificate to be made by the notary, and

directs that, before the secretary of state counts the names certified by any notary, he shall verify the official seal and signature of the notary. None of the signatures believed by the clerks not to be genuine were certified by a notary, as might have been done.

Referring to the initiative and referendum amendment, *supra*, it will be noted that the only qualification the signers of an initiative or referendum petition must have is that they be legal voters. In view of the fact that, though one who possesses the qualifications of citizenship, age, residence, *etc.*, is in a general sense an elector, and is not entitled to vote unless he has been registered a citizen who is not registered is not a legal voter. If he is registered he is a legal voter, and, by the terms of the amendment, is qualified to sign an initiative or referendum petition. The legislature, therefore, transcended its power in requiring the clerk to compare the names of the signers with their signatures on the registration books and blanks on file in his office "for the preceding general election." This method of comparison would exclude from consideration all young men and women who had become of age after the last general election, though they had registered, as well as all others who for any reason had not registered until after the election and thus become legal voters. The legislature was without power to exclude this class and prevent them from exercising all the rights of other legal voters who had registered prior to the election. Therefore the clerks of the several counties were correct in certifying to the secretary of state the names of all signers as genuine whose names appeared upon the books and blanks in their respective offices as registered voters, whether they had voted at the prior election or not.

There was thus made out a *prima facie* case calling for the ordering of a suspension of the amendment to the primary law, and this made it the duty of the secretary of state, under section 109, Revised Codes, to notify the governor that the petition bearing the required number of signers had been filed in his office. This *prima facie* case could not be overcome and the

suspension of the amendment to the primary law be made nugatory only by allegation and proof that a sufficient number of signatures to the petitions from Wheatland, Treasure and Glacier counties, or at least to the petitions from two of them, were not genuine, to require their exclusion from the count. Assuming that the allegations in the affidavit were sufficiently [7] specific to justify the admission of evidence on this point, that introduced by counsel for the relator did not tend to impeach the genuineness of the signatures attached to any one of the petitions in question. It tended merely to show that the clerks had not technically pursued the directions of the statute in ascertaining the number of legal voters who were entitled to sign the petition. This is not the complaint made by the relator. Even so, we should be slow to reach a conclusion by which any legal voter would be prevented from exercising a clear constitutional right by a mere irregularity in the performance of his duty by a public officer.

For these reasons we regarded the application of relator as without merit, and hence set aside the alternative writ and dismissed the proceeding.

ASSOCIATE JUSTICES HOLLOWAY, HURLY, MATTHEWS and COOPER concur.