BURGAN & WALKER, INC., Plaintiff, v.
STATE HIGHWAY COMMISSION et al., Defendants.

(No. 8435.)

(Submitted May 9, 1943.   Decided May 19, 1943.)

[137 Pac. (2d) 663.]

Mr. *Edmond G. Toomey,* Mr. *E. M. Hall,* and *Toomey, Mc-Farland & Hall,* for plaintiff, submitted a brief; Mr. *Toomey* argued the cause orally.

*Mr. R. V. Bottomly,* Attorney General, *Mr. George S. Smith,* Assistant Attorney General, *Mr. H. G. Dean,* Special Assistant Attorney General, and *Mr. I. W. Choate,* Counsel for State Board of Equalization, for Defendants, submitted a brief. *Messrs. Bottomly, Smith* and *Dean* argued the cause orally.

MR. CHIEF JUSTICE JOHNSON delivered the opinion of the court.

Plaintiff, as a taxpayer and as a licensed dealer and distributor of gasoline and motor fuels, seeks to enjoin the defendants from expending public funds and from holding a statewide election as purported to be authorized by Chapter 217 of the Laws of 1943, and in general from giving effect to that chapter. The contention is that in various respects, some of which are hereinafter discussed, the chapter is unconstitutional or otherwise ineffective. The defendants' appearance is by demurrer and by answer not raising any issues of fact.

The chapter is known as "Referendum Measure No. 47" and its title sets forth all its various objects. The chapter contains twenty-five sections, the first eight of which would authorize and provide for the issuance, form, conditions, payment and redemption of the debentures.

Section 4 provides that the issuance and sale of the debentures shall constitute an irrevocable contract between the state and the owner of the debentures that the license or excise taxes imposed by the Act, or by *any other applicable law of Montana upon gasoline or motor fuels,* shall not be reduced, repealed nor diverted "to any other purpose than as at present provided by law" until the principal and interest of the debentures have been paid in full or sufficient funds have been set aside for the purpose.

Section 9 provides for the license taxes for the payment of principal and interest for these debentures. It is as follows:

*"For the purpose of providing funds for the payment of the*

*interest and the maturing principal of the state highway treasury anticipation debentures herein provided for* every distributor referred to and defined in the gasoline license tax laws of the State of Montana now in effect shall pay for the year beginning July 1, 1943, and ending June 30, 1944, and each year thereafter until the principal and interest of all debentures issued under the authority of this Act shall have been paid, to the state board of equalization for deposit into the state treasury, an excise or license tax for the privilege of engaging in and carrying on such business in this state in an amount equal to five cents (5c) for each gallon of gasoline refined, manufactured, produced or impounded by such distributor and sold by him in this state, or shipped, transported or imported by such distributor into and distributed and sold by him within this state, after it has arrived in and is brought to rest within this state, whether sold in the original packages or in the broken packages during such year; provided that all gasoline delivered by any distributor to any of his service stations in this state shall be deemed to have been sold and shall be treated and considered in computing such license tax in the same manner as though the same had been sold to dealers or to other persons. In making the computation of license tax due and in making payment thereof, two per centum (2%) of the amount of such tax shall be deducted by the distributor as an allowance for evaporation and other loss of gasoline handled by such distributor, and every dealer referred to and defined in the gasoline license tax laws of the State of Montana now in effect, shall, for the year beginning July 1, 1943, and ending June 30, 1944, and each year thereafter until the principal and interest of all debentures issued under the authority of this Act shall have been paid, while engaged in such business in this state, pay to the state board of equalization for deposit in the state treasury, a license tax for the privilege of engaging in and carrying on such business in this state, in a sum equal to five cents (5c) for each gallon of gasoline sold or distributed by such dealer in the state during such year; pro-

vided, however, that no gasoline sold by such dealer, which was purchased by him from a producer or distributor, who has paid the tax thereon, shall be included or considered in determining the amount of such license tax to be paid by such dealer, but only such gasoline as was shipped, transported or imported into this state and purchased by such dealer before it had arrived in and was brought to rest within this state and then resold by such dealer, whether in the original packages or in broken packages, shall be included or considered for the purpose of computing such license tax due, provided that no gasoline exported out of the State of Montana shall be included in the computation of any dealer's license tax herein provided for. Two per centum (2%) of the amount of such tax shall be deducted as an allowance for evaporation and other loss of gasoline handled by such dealer. Except as hereinbefore expressly provided all the covenants herein agreed to be performed by the State of Montana shall be for the equal benefit, protection and security of the legal holders of all such debentures and coupons and all debentures issued hereunder shall be of equal rank without preference, priority or distinction as to the benefit, protection and security of this Act, regardless of the maturity of such debentures or of the time or times of their issuance and regardless of any provision or limitation contained in any existing law of the State of Montana pertaining to the imposition of such gasoline license tax or to the period of time during which same shall be effective.

"For the purpose of providing additional funds for the payment of the interest and maturing principal of the state highway treasury anticipation debentures herein provided for every distributor referred to and defined in the gasoline license tax laws of the State of Montana now in effect, shall, from the first day of July, 1943, and until the thirtieth day of June, 1945, pay to the state board of equalization for deposit in the state treasury, an additional excise or license tax for the privilege of engaging in and carrying on such business in this state in an amount equal to one cent (1c) for each gallon of gasoline or motor fuel of more

than forty-six (46°) Taglianbes-Baume gravity test, upon which such distributor is now required to pay the five cent (5c) gasoline license or excise tax, and it is further provided that the state board of equalization shall collect an additional license or excise tax of two and one-half cents (2½c) per gallon on motor fuel of less than forty-six (46°) Taglianbes-Baume gravity test, said additional or supplemental license or excise taxes to be supplemental to and not in lieu of the five cent (5c) excise or license tax. It is further provided that such additional excise or license taxes shall be collected or paid only during the period between July 1, 1943 and the 30th day of June, 1945.

"Any person who shall collect a five cent (5c) per gallon refund on gasoline under the provisions of Section 2396.4 of the Revised Codes of Montana, 1935, as amended by Chapter 67 of the Session Laws of Montana, 1939, shall likewise be entitled to and shall collect an additional one cent (1c) per gallon refund on gasoline upon which the additional one cent (1c) license or excise tax was paid. The state board of equalization shall provide necessary forms and blanks and shall pay the one cent (1c) per gallon refund at the same time and in the same manner that it pays the five cent (5c) per gallon refund.''

Under section 9, it will be noticed (1) that the sole purpose of the taxes is that ''of providing funds for the payment of interest and the maturing principal'' of the debentures authorized by this Act; (2) that the said taxes are not to be effective until July 1, 1943, and (3) that while the 2½c per gallon tax on motor fuel below 46° gravity test is expressly stated to be supplemental to the present tax on such fuel, it is not stated whether the taxes of 5c and 1c to take effect on July 1, 1943, upon gasoline and other motor fuel above 46° gravity test are to be supplemental to or in substitution of the present 5c tax, and that there is no provision that the present 5c gasoline tax shall be repealed by the Act.

Sections 11 and 12 submit ''this law'' to the people ''for their approval or disapproval, and authorization of the liability here-

in created" "pursuant to section 2 of Article XIII of the Constitution of Montana," at a state-wide election to be held on June 8, 1943.

Sections 13 to 22 inclusive provide the preliminaries and procedure for the election. Section 22 appropriates $50,000 from the State Highway Fund to pay the expenses of the election. Section 24 is a severability provision to the effect that the adjudication of the unconstitutionality or invalidity of any "section, provision, clause or phrase of this Act * * * shall not affect the validity of this Act as a whole" or of any part not specifically so adjudged. Section 25 provides:

"This Act shall be in full force and effect from and after its passage and approval and proclamation to that effect by the governor, providing the same shall have received a majority of the votes cast for and against it at the election heren called."

Section 10 provides: "It is hereby provided that if this Act ▮ shall fail to receive the approval of the people at the general election herein provided for, nothing herein contained shall operate to repeal or amend any of the laws of the State of Montana relating to the excise taxes on gasoline or motor fuels."

It will be noted that sections 11 and 12 purport to submit to the people the entire Act, not merely the question of the proposed indebtedness; that section 25 provides that the entire Act shall become effective after its passage, approval and the governor's proclamation to that effect "provided the same shall have received a majority of the votes" at the election. However, section 11 also states that the submission to the people is "pursuant to section 2 of Article XIII of the Constitution" which relates not to the referendum of laws but only to the authorization of public indebtedness by the people. We thus have an awkward question between the utterly inconsistent provisions of the Act as to whether only the incurring of the indebtedness under section 2 of Article XIII of the Constitution, or the entire Act under section 1 of Article V of the Constitution, including also the appropriation of the $50,000, the

authorization of the election and the imposition of the tax, is to be effective only upon the favorable vote of the people. In the latter event, if the words in which the legislative intent is supposed to be expressed mean anything, the election and the expenditure therefor will be legally authorized only if the people authorize them by a favorable vote at the election. On the other hand, if only the incurring of the indebtedness is to be referred to the people, and the rest of the Act is to be effective without it, we would have the taxes imposed by the Act, the purpose of which is limited by section 9 to payment of interest and principal of the proposed indebtedness, effective even though the people might disapprove the indebtedness. It is apparently for the latter reason that the legislature provided by section 10 that if ''this Act'' shall not be approved by the people nothing therein ''shall operate to repeal or amend any of the laws of the State of Montana relative to excise taxes on gasoline or motor fuels.'' The word ''repeal'' is entirely meaningless, since there is nothing in the Act even purporting to repeal any existing provision of law. On the other hand, if none of the Act is to be effective unless approved by the people, it is obvious that without that approval it cannot ''repeal or amend'' anything, regardless of its terms. The only meaning we can attribute, even to the part of the section relating to amendments, is an obscure thought that in spite of the legislative words the effect without section 10 might be to make only the indebtedness dependent upon the vote of the people, and that section 10 may be necessary to prevent the taking effect of the new taxes, which would be useless if the indebtedness, the sole purpose for which they were authorized, should be rejected by the people.

It is argued that section 10 means that if on the other hand the Act *is* approved by the people it *will* ''repeal or amend'' the present law relative to gasoline and motor fuel taxes. It is self-evident that it would in that event *amend* these laws since it would enact further tax provisions. It is equally self-evident

that it will in no event *repeal* those laws since the Act contains absolutely no words or provisions relating to repeals. If, in order to find some meaning for the word "repeal," we assume an intent to repeal the present gasoline tax provision upon the popular approval of Chapter 217, we therefore make meaningless the word "amend", which as above pointed out has a real and apparent meaning.

The holding of this court in *Arps* v. *State Highway Commission*, 90 Mont. 152, 300 Pac. 549, and in decisions in later cases based thereon, that the negative provision of section 10 is to be interpreted as working an implied repeal of present laws upon popular approval, while *res judicata* as to the Act there under consideration, is hereby expressly rejected and disapproved as a precedent with reference to the statute here in question.

While it is possible for us to guess that by this chapter the legislature did not intend to raise the present 5c per gallon gasoline tax to 11c for the next two fiscal years, and 10c thereafter, we can find absolutely nothing in the Act upon which to base such conclusion, and must therefore assume that the chapter intends just what it says, namely, to authorize a new indebtedness and to impose new taxes "for the purpose of providing funds for the payment of the interest and the maturing principal" of that indebtedness. Obviously if the indebtedness is approved by the people, and the tax thereby made effective in accordance with section 10, it amends the gasoline tax statutes by imposing a new tax to pay the new indebtedness, but it repeals nothing; and if disapproved it neither repeals nor amends any statute. With the same reservation as above with reference to the effect of the *Arps Case,* supra, as to the statute there under consideration, we hereby expressly reject, and refuse to follow as a precedent with regard to the Act here in question, the holding that the legislative intent was to repeal the present 5c tax if the proposed debentures should be approved and if the new 5c or 6c tax for the payment thereof should therefore become effective under section 10.

That such repeal of the present 5c tax was not intended is ██ ██ further indicated by the fact that it could not constitutionally have been intended, since the present tax cannot constitutionally be repealed nor reduced nor any part of its proceeds diverted to other purposes until the debentures issued under the law establishing that tax have been retired or their payment provided for, and since the taxes proposed by Chapter 217 can be used only to pay the principal and interest of the new debentures proposed by it, and not the old debentures issued under the old law. It is true that section 6 provides that out of the proceeds of the new 1944 debentures to be issued under this chapter, sufficient money shall be set aside to pay the principal and interest of all 1939 debentures ''now outstanding'' and optional for payment in 1944; but the section does not state that that provision is in lieu of the present 5c tax, but only that it is intended ''to add to the security of the holders'' of those debentures ''and not to in any manner impair their security.'' ██ If the present taxes for the payment of the 1939 debentures are now repealed by this chapter and no proceeds are supplied to pay those debentures until such time as sufficient 1944 debentures are sold, the holders' security will clearly be impaired rather than added to. Since the repeal of the present 5c tax or the diversion of part of the proceeds thereof to the payment of the new debentures would therefore be a breach of the contract with the holders of the present outstanding debentures, and since the new 6c or 5c tax cannot be used for the purpose, and since section 6 expresses an intent not to impair that security but on the contrary to add to it, we cannot find a legislative intent to repeal the present 5c tax, whatever may be our guess as to the unexpressed purpose of the legislature. It seems apparent, therefore, that poorly worded, contradictory and equivocal as the chapter is in numerous respects, there can be no doubt that if the Act is approved by the people the new tax will be in addition to the old and not in

repeal and substitution of it. This is practically the only respect in which the Act is not ambiguous.

There is very evident ambiguity as to what is intended to be ▮ submitted to the people. As noted above, the entire Act is said to be submitted, although reference is made to section 2 of Article XIII of the Constitution, which relates only to the approval of indebtedness by the people. However, if the entire Act is submitted, as the legislature has expressly provided, it can only be under section 1 of Article V, which contains no reservations and is therefore mandatory as to the matters of which it speaks. (Sec. 29, Art. III, Constitution of Montana.) That constitutional provision, however, provides that the initiative and referendum powers reserved to the people do not extend to appropriations of money. We must conclude, therefore, that the appropriation provision set forth in section 22 of the Act, cannot constitutionally be submitted to the people at all.

It follows, therefore, that in spite of the reference to section 2 of Article XIII, relating only to the approval of indebtedness, the legislature expressly purported to refer to the people the entire Act, including the appropriation (which it could not constitutionally refer under section 1 of Article V), and to make the entire Act effective only upon approval by the people (which it could not logically do if the election were to be held at all); and that in an attempt to make certain that the tax should not be effective as an amendment to the present tax laws unless the people should approve the Act (and therefore the indebtedness to the payment of which the taxes were limited by section 9 of the chapter), the legislature added section 10, so that in that event the gasoline tax statutes would not be considered amended.

Since we find the appropriation provision presently effective, ▮ and since the provision for the election must logically be considered as in effect in spite of the absurd, multifarious, equivocal and contradictory language used in the Act, we come therefore to the question whether in view of the severability

provision the proposed Act other than the appropriation and election provisions may be submitted to the people. If so, the injunction prayed for must be to that extent denied.

However, we find that the provisions for the referendum require that the entire Act be submitted to the people, that the entire title of the Act, showing all of its purposes, shall be printed upon the ballot, and that the alternatives upon which the voters shall vote are "for the above entitled *Act*" and "Against the above entitled *Act*." We cannot without clearly judicial legislation amend the form of the ballot, or the issue provided thereby, so as to permit the voters to express their preference upon only part of the Act, rather than upon the entire Act. Coming as the objection does before the election, there is no burden upon the plaintiff to show that the people have been misled by the wording of the ballots, but the conclusion is inescapable that the entire Act, including the appropriation provision and the provision for the holding of the election, cannot constitutionally or logically be submitted to the people, that the ballots as provided by statute would necessarily be misleading to the voters, and that we cannot amend the statutory provisions relative to the election or the ballots so as to state the issues which are properly submitted to the people or to reserve the matters which cannot be so submitted.

But even if we could avoid that difficulty we would be met with still another one, which is suggested by the provisions of sections 11 and 12 that "this law" shall be "submitted to the people," and the equivocal provision making it doubtful whether all qualified voters or only those on the tax rolls may vote (but which probably can be interpreted as meaning only the latter).

If only the question of the indebtedness were referred to the voters, the uncertainty would be resolved by section 2 of Article IX of the Constitution, which provides that only voters whose names appear on the tax rolls are eligible to vote. But since the entire Act is referred to the people (with the exception of the appropriation provision, which cannot constitutionally be

referred, and the authorization of the election itself, which cannot logically be referred), it must, under section 1 of Article V of the Constitution, except as to the indebtedness feature, be referred to "the legal voters," which means that the legislature cannot impose other qualifications. (*State ex rel. Gleason* v. *Stewart*, 57 Mont. 397, 188 Pac. 904.)

Thus we have an utterly inconsistent and irreconcilable situation,— an *Act,* for or against which all the legal voters are entitled to vote, except as to the indebtedness provision; and an indebtedness provision, upon which only the legal voters who are also taxpayers may vote. There is no way of reconciling the inconsistency or of separating the two issues; the legislature has specified the contents of the ballot, with the only issue the approval of the Act.

Chapter 217 being thus hopelessly inconsistent, irreconcilable, impossible of effectuation and void because of uncertainty, and therefore ineffectual and inoperative for any purpose, we must accordingly enjoin the holding of the election as an unauthorized and a useless and meaningless act. Numerous other uncertainties, absurdities, inconsistencies and impossibilities in the chapter need not here be mentioned.

Lest what we have said be misunderstood, it seems advisable to add that the miserably abortive form of the chapter is apparently due, not to improper legislative action, but to legislative negligence in receiving the proposed bill, as drafted by the administrative branch, as an eleventh hour matter, and in considering it superficially and hurriedly without the ordinary legislative procedure calculated to make it an effective vehicle to convey the legislative intent. In other words, its essential character is that of legislation by administrative resolution or decree rather than by the representative legislative process with the safeguards developed by parliamentary experience.

In partial explanation of the decisions which we have overruled as bad law we should add that all or most of such decisions involved attacks made after election, in which case the

472

questions were whether the provisions were mandatory or directory or whether the obvious defects were cured by the election. However, in the present instance, it seems that all three branches of the state government must share some blame for this impossible, meaningless and absurd piece of attempted legislation.

There is no imaginable reason why the legislature cannot draft, or if it does not draft, why it cannot amend bills so as to make them express the legislative intent. If that cannot be done, the unique American experiment in government of laws rather than of men cannot succeed, and those men who happen at the time to be administering or interpreting the statutes as executive or judicial officers must guess or imagine the legislative intent. To the extent to which, by approving such abortive Acts, and by supplying their own personal guesses of legislative intent, judicial officers encourage the practice, they are substituting their *ipse dixit* for definite laws, thus contributing directly to the present "new order" reaction to the old order of personalized government. The emergency does not justify that course, if indeed any possible emergency can ever justify it.

If the intent was to authorize the new debentures, to continue the present taxes on motor fuel and to enact additional ones, and to provide that the proceeds of those taxes might be used directly for construction and repair of highways as well as for payment of interest and principal of the debentures, and to submit to the people either the indebtedness proposal alone or the entire Act except the appropriation and election provisions, there is no reason why words could not have been found to express that intent. The necessary words not having been found by those upon whom the people have imposed that duty and power, the courts may not supply them.

The injunction is granted as prayed for, enjoining the defendants from expending further funds under the Act and from proceeding with the election in question.

ASSOCIATE JUSTICES MORRIS, ANDERSON and ADAIR concur.